**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRCIT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| TERESA HERNANDEZ, )<br>)<br>Plaintiff, )<br>) No. 15 CV 3817<br>v. )<br>) Magistrate Judge Michael T. Mason<br>CAROLYN W. COLVIN, Acting )<br>Commissioner of Social Security, )<br>)<br>Defendant. ) | |

## Memorandum Opinion and Order

MICHAEL T. MASON, United States Magistrate Judge:

Claimant Teresa Hernandez ("Claimant") has brought a motion for summary judgment (Dkt. 10) seeking judicial review of the final decision of the Commissioner of Social Security (the "Commissioner"). The Commissioner denied Claimant's request for Disability Insurance Benefits ("DIB") under the Social Security Act, 42 U.S.C. §§ 416(i) & 423(d). The Commissioner has responded to the motion (Dkt. 19), asking the Court to uphold the decision of the Administrative Law Judge (the "ALJ"). This Court has jurisdiction to hear this case pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, Claimant's motion for summary judgment is denied and the Commissioner's request for summary judgment is granted.

**I. BACKGROUND**

**A. Procedural History**

Claimant filed her application for DIB on September 23, 2011, alleging disability beginning July 11, 2011 due to lupus and related fatigue. (R. 165, 196-97.) Her claim was denied initially in January 2012, and again upon reconsideration in July 2012. (R.

1

158-65, 167-70.) Claimant filed a timely request for a hearing. (R. 172-73.) On June 19, 2013, Claimant appeared with counsel and testified at a hearing before ALJ Robert Senander. (R. 126-51.) A vocational expert also provided testimony. On November 14, 2013, the ALJ issued a written decision denying Claimant's application for benefits. (R. 25-31.) Claimant submitted a timely request for a review by the Appeals Council, which was denied on February 26, 2015. (R. 1-8, 17.) At that point, the ALJ's decision became the final decision of the Commissioner. *Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001). Claimant filed this action and the parties consented to the jurisdiction of this Court pursuant to 28 U.S.C. § 636(c).

**B. Medical Evidence**

**1. Treating Physicians**

The medical records indicate that Claimant was diagnosed with systemic lupus erythematous ("SLE") and lupus nephritis (or inflammation of the kidneys) as early as 2007. (R. 294, 315.) Records from Loyola Family Practice Center reveal that Claimant was experiencing high levels of protein in her urine (or proteinuria) in March 2010 and was taking a higher dose of prednisone (20 mg) as a result. (R. 294, 298.) The increased prednisone led to poor sleep and constant fatigue. (R. 293.) It was noted that past treatment with mycophenolate mofetil ("MMF") was not successful. (R. 294.) By April 20, 2010, Claimant's levels and symptoms had resolved, and her doctors planned to taper her prednisone dosage back to 5 mg. (*Id.*) Her blood pressure was well-controlled with lisiniprol. (*Id.*)

It appears Claimant was primarily treated by rheumatologist Dr. Daniel Hirsen at DJH Rheumatology, whose treatment records date back to June 2010. (R. 314.) By

that point, Claimant was taking only 10 mg of prednisone and Dr. Hirsen commented on the recent flare up. (*Id.*) Her muscles were noted as strong the next month, though she complained of occasional myalgia (or muscle pain) and recent chest pain. (R. 313.)

By March 2011, Claimant's prednisone dosage had been tapered back down to 5 mg. (R. 311.) She continued to complain of some muscle pain and fatigue at her next few visits. (R. 309-10.) She reported her fatigue had increased in July 2011, and she was still experiencing widespread muscle pain. (R. 308.) Tenderness in her hands was also noted. (*Id.*) It appears she was also started on methotrexate ("MTX"). (*Id.*) Her pain had not improved the following month. (R. 307.)

At some point it appears that Dr. Hirsen referred claimant to Nephrology Associates for assessment. (R. 313.) There, Dr. Matthew Andersen described claimant's proteinuria as moderate in severity, but stable as of September 12, 2011. (R. 365.) At that visit, Claimant complained of occasional numbness in her face for the previous month and "debilitating fatigue." (*Id.*) Dr. Andersen noted that Claimant seemed to be doing well based on lab reports, but that she was reporting a number of symptoms likely related to her SLE. (R. 366.) Dr. Andersen was hopeful that over time she would see more relief from her plaquenil (or hydroxychloroquine) medication, and he continued her on 5 mg of prednisone and lisinopril. (*Id.*) A few days later, Claimant complained to Dr. Hirsen that she was tired from the MTX, so he decreased her dosage. (R. 306.) Her muscles were again noted as strong. (*Id.*) On October 25, 2011, Claimant reported she was still tired, but not in pain (R. 305.) Dr. Hirsen discontinued her prescription for MTX. (*Id.*)

On January 27, 2012, Claimant complained to Dr. Hirsen that her muscle pain had increased since she stopped taking MTX. (R. 351.) She was experiencing minor joint pain the following month. (R. 350.) By early April 2012, Claimant had been started on MMF again and was doing "fairly well" according to notes from Dr. Andersen (R. 367.) Her lab reports showed progress, and she was ordered to continue taking lisinopril, MMF, and prednisone. (R. 368.) Around that same time, Claimant told Dr. Hirsen that her joint and muscle pain were better, and that she was only experiencing some dizziness as a side effect of one of her medications. (R. 349.) She reported neck pain in June 2012 and minor pain in her forearms in mid-September 2012. (R. 363-64.)

Claimant presented to the ER at MacNeal Hospital on September 25, 2012, complaining of a headache and neck pain. (R. 382.) She admitted to sleeping in an uncomfortable position the previous night, but also reported band-like headaches and recent life stressors. (*Id.*) She explained that she was feeling chronically weak and fatigued. (*Id.*) She denied dizziness at the time, but otherwise reported some dizziness upon sudden head movements. (*Id.*)

A physical exam revealed unremarkable results, apart from some tenderness to palpation in the neck region. (R. 383.) A CT scan was essentially normal. (R. 379, 389.) Claimant was diagnosed with a cervical sprain or strain, and was discharged the same day with directions to take hydrocodone and ibuprofen as needed. (R. 379-80.)

Claimant returned to see Dr. Andersen on November 2, 2012. (R. 374.) She was no longer taking MMF and was feeling "well overall," but "tired rather often." (*Id.*) Her creatinine level was stable, though her labs were showing some proteinuria. (*Id.*) Dr. Andersen noted, however, that her proteinuria had improved overall from a few

4

years prior.  (*Id.*)  He considered increasing her lisiniprol, but was concerned it may cause additional fatigue.  (*Id.*)  She was directed to continue on the same medication regime and to follow-up in six months.  (R. 374-75.)

Claimant reported minor forearm pain to Dr. Hirsen on February 1, 2013.  (R. 376.)  A bone density test performed on February 19, 2013 was normal.  (R. 390.)

### 2. Agency Physicians

Claimant was examined by Dr. Dilip Patel on January 12, 2012.  (R. 315-19.)  Dr. Patel noted that Claimant was diagnosed with SLE six years prior.  (R. 315.)  Claimant complained of "constant aching of the right forearm," and constantly feeling tired.  (*Id.*)  At the time of the examination, Claimant was taking lisinopril, vitamin B6, hydroxychloroquine, and prednisone.  (*Id.*)

Dr. Patel's physical examination revealed primarily normal results.  (R. 316-17.)  Claimant exhibited normal range of motion of the neck, extremities, and back.  (*Id.*)  Her gait was normal and she did not require an assistive device.  (R. 317.)  A neurological exam and mental status exam both yielded normal results.  (*Id.*)  Her hand dexterity and grip strength were normal, and she was able to heel/toe walk, squat and rise, and get on and off the exam table.  (*Id.*)  Dr. Patel's impression included ischemic lupus erythematous, with associated fatigue, and lupus nephritis.  (R. 317.)

On January 23, 2012, Dr. Richard Bilinsky reviewed the file and, citing the results of the consultative exam, concluded that Claimant did not suffer from a severe physical impairment that precluded work activity.  (R. 321-23.)  Dr. Bilinsky deemed Claimant partially credible, but ultimately determined that the objective findings did not support a finding of a severe physical limitation.  (R. 323.)  On reconsideration, Dr. Bilinsky's

assessment was affirmed by Dr. Calixto Aquino after he reviewed additional records Dr. Hirsen. (R. 359-61.)

Following the hearing, Dr. Mark Farber responded to a medical interrogatory from the ALJ. (R. 393-410.) On September 5, 2013, Dr. Farber concluded that Claimant suffered from the severe impairments of systemic lupus and lupus nephritis. (R. 393.) According to Dr. Farber, Claimant did not meet section A or B of Listing 14.02, in part because she did not have end organ damage. (R. 394.) Dr. Farber opined that Claimant would be limited to sedentary work due to inflammation, fatigue, and arm pain. (R. 395.) Specifically, in Dr. Farber's opinion, Claimant could lift and carry ten pounds occasionally, and less than ten pounds frequently; could sit for six to eight hours in an eight-hour day; and could stand and/or walk for two hours in an eight-hour day. (*Id.*) He recommended no additional restrictions. (*Id.*) In support of his conclusions, Dr. Farber submitted and highlighted some of Claimant's records, such as lab reports and the findings from the consultative exam. (R. 396-409.)

### C. Claimant's Testimony

In June 2013, Claimant appeared with counsel at the hearing before the ALJ and testified through an interpreter as follows. At the time of the hearing, she was 34 years old, 5'4" tall, and weighed two hundred pounds. (R. 129.) She resides in a house with her husband and six-year old daughter. (*Id.*) She is able to drive without any difficulties. (R. 129-30.) She completed the equivalent of high school in Mexico and has taken English classes in the U.S. (R. 130.)

Claimant previously worked for twelve years as a candy packer. (R. 132.) She was diagnosed with lupus in 2006, but was able to continue working through her fatigue.

(*Id.*) According to Claimant, her fatigue and weakness progressively worsened and she started to call off sick from work. (*Id.*) She eventually stopped working in July 2011 because she did not have the strength to continue. (*Id.*)

Claimant testified that she continues to suffer from fatigue every day, worsened by certain activities. (R. 136.) She is treated by Dr. Hirsen. (R. 133.) Claimant explained that when her fatigue worsened, Dr. Hirsen was also concerned about the levels of protein in her urine, so he referred her to a kidney specialist. (*Id.*) At the time of the hearing, Claimant was taking prednisone, lisinipril, and hydroxychloroquine. (R. 134-36.)

Since February of 2011, Claimant has been attending English classes four days a week for four hours each day. (R. 136-37.) She explained that she started taking English classes after she stopped working because she had more time and because her doctors do not speak Spanish. (R. 141.) She usually misses one class a week due to her fatigue. (R. 137.) When she does attend class, she is unable to perform household activities afterwards, because she prefers to use her energy spending time with her daughter. (*Id.*) She likes to do low energy activities with her daughter, like read books or sit outside in the yard. (R. 137-38.) Claimant's sister and sister-in-law help her take care of her daughter by picking her up from school twice a week and spending two to three hours with her twice a week. (R. 138-39.)

Claimant can care for herself without difficulty, although at times she does not shower due to fatigue. (R. 139.) She sleeps well, from approximately 9:30 p.m. to 7:00 a.m., and usually takes an hour and a half nap in the afternoon. (R. 139-40.) Her fatigue has interfered with her ability to socialize and attend family events because she

7

is sometimes too tired to go. (R. 140.) She does not go shopping unless it is necessary. (R. 141.)

Claimant estimated that she can lift five to ten pounds, and walk for four to six blocks before feeling fatigued and needing to rest for the remainder of the afternoon. (R. 141-42.) She testified that she can sit for three hours before needing to rest for an hour or two. (R. 142.)

### D. Vocational Expert's Testimony

A vocational expert ("VE") also provided testimony at the hearing. The VE classified claimant's past relevant work as a candy packer, which is unskilled and usually performed at the medium level of exertion. (R. 131.) Claimant, however, performed the position at the light level of exertion. (*Id.*)

The ALJ asked the VE to consider a hypothetical individual who could lift ten pounds frequently and twenty pounds occasionally, and could sit and stand for six hours in an eight-hour day. (R. 142.) The VE testified that the individual could perform Claimant's past work as she performed it. (*Id.*) The individual could also perform light, unskilled work as an assembler, housekeeping cleaner, or sewing machine operator. (R. 142-44.)

Next, the ALJ changed the hypothetical to a person who could lift ten pounds frequently and ten pounds occasionally, stand for two hours, and sit for six hours in an eight-hour day. (R. 144.) The ALJ reminded the VE that Claimant speaks Spanish, and that the VE must keep that factor in mind when considering the hypotheticals. (*Id.*) The VE testified that the second hypothetical individual could not perform Claimant's past relevant work, but could work in the sedentary, unskilled positions of waxer, washroom

8

operator, or laminator. (R. 144-46.) The VE confirmed that all of his answers were consistent with the Dictionary of Occupational Titles. (R. 146.)

Upon questioning by Claimant's counsel, the VE testified that an individual who would be off task twenty percent of the day due to fatigue would be unable to perform the jobs he cited. (R. 146.) According to the VE, employers would expect an individual to be on task ninety percent of the work day, and would tolerate no more than one missed day of work per month. (R. 146-47.) The VE further explained that the positions he cited would require very basic receptive language skills, and that hearing and understanding what people were saying would be more important than being able to communicate. (R. 147.)

## II. LEGAL ANALYSIS

### A. Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater,* 55 F.3d 300, 305 (7th Cir.1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). We must consider the entire administrative record, but will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003) (citing *Clifford v. Apfel,* 227 F.3d 863, 869 (7th Cir. 2000)). This Court will "conduct a critical review of the evidence" and will not let the ALJ's decision stand "if it

9

lacks evidentiary support or an adequate discussion of the issues." *Lopez,* 336 F.3d at 539 (quoting *Steele,* 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," she "must build an accurate and logical bridge from the evidence to [her] conclusion." *Clifford,* 227 F.3d at 872. The ALJ must "sufficiently articulate her assessment of the evidence to assure us that she considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir.1993) (per curiam) (quoting *Stephens v. Heckler,* 766 F.2d 284, 287 (7th Cir.1985)).

## B. Analysis Under the Social Security Act

In order to qualify for benefits, a claimant must be "disabled" under the Act. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Hatler*, 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the

burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

The ALJ applied this five step analysis here. At step one, the ALJ determined that Claimant had not engaged in substantial gainful activity since the alleged onset date of disability. (R. 27.) Next, at step two, the ALJ identified Claimant's systemic lupus as a severe impairment. (*Id.*) The ALJ found, at step three, that the Claimant's impairment did not meet or medically equal any of the Listings identified by the Commissioner as conclusively disabling, including Listing 14.02 for systemic lupus. (R. 27-28.) The ALJ went on to assess Claimant's RFC, ultimately concluding that she could perform a range of sedentary work as defined in 20 C.F.R. 404.1567(a). (R. 28-30.) Based on this RFC, the ALJ found, at step four, that Claimant could not perform her past relevant work as a candy packer. (R. 30.) However, at step five, the ALJ concluded that Claimant could perform other work in the national economy, including work as a waxer, washroom operator, or laminator. (R. 31.) As a result, the ALJ entered a finding of not-disabled. (*Id.*) Claimant now asks the Court to reverse the ALJ's finding.

### C. The ALJ's Decision is Supported by Substantial Evidence and Free from Legal Error.

In attacking the ALJ's decision, Claimant argues that he failed to properly consider her fatigue in his RFC assessment and failed to properly assess her credibility as related to her fatigue. The Commissioner responds that the ALJ's decision is supported by substantial evidence and free from legal error. The Court agrees.

To begin, the RFC is the most a claimant can do despite her limitations. 20 C.F.R. §§ 404.1545(a). In assessing a claimant's RFC, the ALJ will consider all of the

11

relevant medical and other evidence in the record, including evidence of impairments that are not severe. *Id*; *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). The RFC assessment must contain a narrative discussion describing how the evidence supports the ALJ's conclusions and explaining why any medical source opinion was not adopted if the ALJ's RFC assessment conflicts with such an opinion. SSR 96-8p, 1996 WL 374184, at **5, 7; accord *Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). As a general matter, a court will uphold an ALJ's decision "if the evidence supports the decision and the ALJ explains his analysis of the evidence with enough detail and clarity to permit meaningful review." *Arnett v. Astrue*, 676 F.3d 586, 591-92 (7th Cir. 2012) (citing *Eichstadt v. Astrue*, 534 F.3d 663, 665-66 (7th Cir. 2008)).

Here, the ALJ ultimately concluded that Claimant could perform sedentary work. In reaching this conclusion, among other things, the ALJ relied on what he viewed as a limited treatment history documenting the existence of her lupus, "conservative and inconsistent" treatment, lack of supporting objective evidence, and the medical opinion evidence of record. (R. 29.) Specifically, the ALJ pointed out that Claimant had only occasional visits with what he thought was her primary care physician and a single ER visit. He noted that Claimant had only been treated with medication, and that her dosage had not been increased since her alleged onset date. The ALJ acknowledged Claimant's "sporadic[]" complaints of fatigue, as well as her hearing testimony, but also pointed out the occasions when Claimant reported to her doctors that she was feeling well. (R. 29.) The ALJ did not give weight to the opinions of the agency physicians, who opined at the initial level and upon reconsideration that Claimant did not have any severe impairments. Instead, in addition to the other evidence, the ALJ relied on the

12

primarily benign results of the consultative exam, and gave great weight to Dr. Farber's opinion, who had reviewed the record, including Claimant's complaints of fatigue.

Unlike Claimant, we see no reversible error in the ALJ's assessment of RFC, in particular as it relates to Claimant's fatigue. According to Claimant, the ALJ erred by downplaying Claimant's treatment as only occasional; describing her complaints of fatigue as sporadic; mistakenly describing Dr. Hirsen as her primary care physician; and relying too heavily on Claimant's occasional reports of feeling well. In Claimant's opinion, the ALJ "ignored an entire line of evidence by not considering the consistent reports of fatigue that appear in the various' doctors notes." (Mot. at 9.)

However, as the Commissioner argues, Claimant's disagreement with the ALJ's characterization of her fatigue and frequency of treatment is not enough, standing alone, to warrant remand. This is not a case where the ALJ ignored an entire line of evidence, as the ALJ explicitly considered Claimant's complaints of fatigue as set forth in her testimony and in the medical records. In fact, the ALJ even addressed similar arguments raised at the administrative level by Claimant's previous attorney in response to Dr. Farber's opinion. Specifically, the ALJ stated that counsel's "citation of a handful of occasions in which the claimant reported fatigue is not at all persuasive that Dr. Farber's opinion is an inaccurate representation of the claimant's residual functional capacity." (R. 29.)

Further, although the ALJ improperly described Dr. Hirsen as a primary care physician instead of a rheumatologist, we note, as did the Commissioner, that neither Dr. Hirsen nor Dr. Anderson provided their opinions as to Claimant's functional capacity here. Therefore, the ALJ was not tasked with assessing the weight to afford any

opinions of those treating physicians.  *See* 20 C.F.R. § 404.1527 (setting forth the treating physician rule).  More importantly, given the lack of opinion evidence from Claimant's treating physicians, the ALJ was permitted to rely on the medical opinion of Dr. Farber, who reviewed the entire case record and concluded that Claimant could perform sedentary work despite her lupus and associated fatigue and inflammation. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("The ALJ was entitled to rely on medical experts when no contrary evidence is presented.").

As for the ALJ's credibility assessment, we first acknowledge that the Social Security Administration recently updated its guidance about evaluating claimant's symptoms in disability claims.  *See* SSR 16-3p, 2016 WL 1119029 (March 16, 2016). The new ruling eliminates the term "credibility" from the Administration's sub-regulatory policies to "clarify that subjective symptom evaluation is not an examination of the individual's character."  *Id.* at *1.  Though SSR 16-3p post-dates the ALJ's decision in this case, the application of a new social security regulation to matters on appeal is appropriate where, as here, the new regulation is a clarification of, rather than a change to, existing law.  *Pope v. Shalala*, 998 F.2d 473, 482-483 (7th Cir. 1993), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999); *see also*, *Cole v. Colvin*, No. 15-3883, 2016 WL 3997246, at *1 (7th Cir. 2016) ("The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain assertions by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence.").

As before, under SSR 16-3p, the ALJ must carefully consider the entire case record and evaluate the "intensity and persistence of an individual's symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities." SSR 16-3p, 2016 WL 1119029 at *2. The ALJ is obligated to consider all relevant medical evidence and may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding. *Goble v. Astrue*, 385 Fed. App'x. 588, 593 (7th Cir. 2010). However, the ALJ need not mention every piece of evidence so long as she builds a logical bridge from the evidence to her conclusion. *Id.* Consequently, we will only reverse the ALJ's credibility finding if it is "patently wrong." The ALJ's credibility determination is patently wrong if it lacks "any explanation or support." *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

In making a credibility determination, the ALJ "may not disregard subjective complaints merely because they are not fully supported by objective medical evidence." *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995). Rather, SSR 16-3p requires the ALJ to consider a number of factors in addition to the objective medical evidence including (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the pain or other symptoms; (3) factors that precipitate and aggravate the symptoms, (4) the type, dosage, effectiveness and side effects of medication; (5) any treatment, other than medication, for relief of pain or other symptoms; (6) any measures the claimant uses to relieve the pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. SSR 16-3p, 2016 WL 1119029 at *7.

On this issue, Claimant again contests how the ALJ weighed and considered her complaints of fatigue. But as discussed above, the ALJ did not completely ignore Claimant's complaint of fatigue. Instead, the ALJ considered Claimant's complaints, but simply did not find support in the record, whether through objective medical evidence or otherwise, for those complaints. The ALJ cited to the lack of objective medical evidence, but also considered other factors set forth in SSR 16-3, such as Claimant's treatment history, her daily activities, and her medication. Having properly done so, we cannot say that the ALJ's assessment of Claimant's fatigue was patently wrong or unsupported by substantial evidence. *See Drea v. Barnhart*, 58 F. App'x 225, 229 (7th Cir. 2003) (though unpublished, finding that substantial evidence supported the ALJ's decision to discredit a claimant's subjective intermittent complaints of fatigue).

On the record before us, it is immaterial that the ALJ did not mention every single complaint of fatigue or weighed the evidence differently than would Claimant or the court. See *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (the court may not reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute its own judgment for that of the Commissioner). Here, where the ALJ properly considered the evidence before him, including Claimant's fatigue, the decision is supported by substantial evidence.

### III. CONCLUSION

For the reasons set forth above, Claimant's motion for summary judgment is denied and the Commissioner's motion for summary judgment is granted. The decision of the ALJ is affirmed. It is so ordered.

**Michael T. Mason
United States Magistrate Judge**

**Dated: September 7, 2016**